# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| SELENA BLACKSTONE, *Personal Representative of the Estate of Theresa Viola Whitley, et al.*, | ) ) ) ) |  |
| Plaintiffs, | ) ) ) |  |
| v. | ) ) | Civil Action No. 13-cv-0896 (KBJ) |
| JAMES BRINK, *et al.*, | ) ) |  |
| Defendants. | ) ) |  |

## MEMORANDUM OPINION

This case arises out of the tragic and untimely death of pedestrian Theresa V. Whitley ("Whitley" or "the decedent") in June of 2012, in the District of Columbia. Mrs. Whitley was crossing the intersection of New York and New Jersey Avenues, Northwest, when one or more vehicles struck and killed her. (Am. Compl. ("Compl."), ECF No. 6, ¶ 9.) Her family subsequently employed attorney Ronald Mitchell ("Mitchell" or "Plaintiffs' Counsel") to represent her estate with respect to legal claims arising from that fatal incident, and in this capacity, Mitchell entertained a settlement offer from State Farm Insurance Company ("State Farm") on behalf of one of the drivers involved in the accident, James Manley Brink ("Brink" or "Defendant"). Specifically, State Farm Claims Representative Paul Oltchick ("Oltchick") offered the estate (through Mitchell) a $100,000 payment—the maximum under Brink's policy—to settle all anticipated claims against Brink on May 10, 2013, before any lawsuit was filed. (*See* Aff. of Paul Oltchick ("Oltchick Aff."), Ex. 1 of Def.'s Mot. to Enforce,

1

ECF No. 10, ¶ 4.)  The instant dispute centers on whether Mitchell, in fact, accepted this settlement offer on behalf of his clients.

Before this Court at present is Defendant Brink's motion to enforce the alleged settlement agreement, and thereby to truncate the wrongful death lawsuit that Mitchell subsequently filed against Brink and another driver in this Court on behalf of the estate ("Plaintiffs").[1]  This Court held an evidentiary hearing at which both Mitchell and Oltchick testified about the facts and circumstances related to the alleged settlement agreement, with Mitchell claiming that no agreement was ever reached and Oltchick refuting that contention.  After consideration of the evidence presented, the Court finds that Oltchick's version of the relevant events—which is entirely consistent with the existing documentary evidence—is by far more credible.  Consequently, as explained below and as set forth in the accompanying order, Brink's motion to enforce the settlement agreement will be **GRANTED**.

I.    **FACTS**

Brink and the decedent were involved in the fatal car collision on June 23, 2012.  (Am. Decl. of Ronald F. Mitchell ("Mitchell Decl. II"), ECF No. 21-1, ¶ 1; Suppl. Aff. of Paul Oltchick ("Suppl. Oltchick Aff.") ECF No. 22, ¶ 2; Def. Brink's Stmt. of Relevant Facts as to Formation of Settlement Agreement ("Def.'s Facts"), ECF No. 19, ¶ 1.)  Although the particular details of the collision itself are not germane to the instant motion, some facts provide helpful context for an understanding of the settlement discussions that followed.  According to the complaint, Brink ran a red light, colliding with another driver's car, which caused one of the two cars to strike and hit Whitley as

---

[1] Plaintiffs filed the complaint in this matter on June 13, 2013, against Brink and also defendant Herman Scriven, who was driving a second car involved in the accident.  (*See* Compl. ¶¶ 6, 10.) Defendant Scriven is not a party to the pending motion.

she was crossing that intersection.  (Compl. ¶¶ 9, 11, 36.)  Whitley later died as a result

of the injuries she sustained in the accident.  (*Id.* ¶ 14.)  On August 9, 2012, Mitchell

was retained to represent the decedent's estate.  (Def.'s Facts ¶ 5.)

### A.   State Farm's Practices And Defendant Brink's Insurance Policy

Brink has an automobile insurance policy with State Farm.  (Suppl. Oltchick Aff.

¶ 2.)  Significantly for present purposes, there are at least two types of auto insurance

coverage available at State Farm:  (1) liability insurance, and (2) personal injury

protection ("PIP") insurance.  (*See* May 29, 2014, Evidentiary Hr'g Tr. ("Hr'g Tr.") at

68.)  Liability insurance covers a variety of expenses related to accidents that occur due

to the fault of the insurance policyholder, while PIP (also known as "no-fault

coverage") is available as an additional source of payment—regardless of

determinations of liability—for post-accident medical expenses in certain states.  (*See*

*id.* at 54.)[2]  In the District of Columbia, an accident victim may recover both liability

damages and PIP benefits when her injuries are substantial or permanent, D.C. Code

§ 31-2405(b), and the goal of PIP benefits, where applicable, is to provide full recovery

of out-of-pocket expenses for an accident victim's medical bills, *see Monroe v.*

*Foreman*, 540 A.2d 736, 741 (D.C. 1988) (citation omitted).  By contrast, when an

injured person is not eligible for PIP benefits and receives only liability damages, any

amount that the recipient owes for outstanding medical bills is ordinarily paid out of the

liability proceeds.  (*See* Suppl. Oltchick Aff. ¶ 8.)  *See also, e.g.*, 42 U.S.C. § 1395y

(requiring both that the recipient of liability proceeds pay off any Medicare liens and

---

[2] *See also* State Farm, *Auto Insurance Coverage That Fits You*,
https://www.statefarm.com/insurance/auto/coverage-options (last visited Aug. 11, 2014) (describing the
types of insurance coverage available).

that insurers report settlements to Medicare).  Thus, in the absence of PIP benefits, the amount due for hospital bills and other medical costs, such as payments to Medicare, must be satisfied out of the take-home award from any settlement offer with an insurance company.

In this case, Brink's State Farm insurance policy provided for liability coverage not to exceed $100,000.  (*See* State Farm Ins. Policy of James Manley Brink ("Brink Ins. Policy"), Ex. 4 of Mitchell Decl. II, ECF No. 21-2, at 12.)  Brink's policy also provided for PIP coverage, but only in a limited range of circumstances; specifically, PIP coverage was not available if the injured individual "is not a resident of Maryland and sustains bodily injury while a pedestrian in an accident outside of Maryland."  (*See* July 30, 2013, No-Fault Coverage Letter ("July 30 No-Fault Coverage Letter"), Ex. 7 of Def.'s Facts at 25.)  Also noteworthy is State Farm's internal corporate structure:  all claims related to PIP insurance coverage are handled by a distinct department within State Farm, separate and apart from the unit that manages (and attempts to settle) liability claims.  (*See* Hr'g Tr. at 68.)

### B.  The Settlement Negotiations

The recitation of facts herein is drawn from the complaint, the parties' briefing on the motion to enforce, and the testimony and documentary evidence introduced at the evidentiary hearing.  The parties in this matter agree on very little regarding the course of events preceding the alleged settlement agreement; consequently, the next section contains the undisputed facts about the correspondence and conversations between Mitchell and State Farm representatives regarding settlement of the estate's potential claims against Brink, while following that is a recitation of the parties' competing

4

versions of the material facts in dispute. Notably, one critical undisputed fact that weighs heavily in this Court's consideration of the instant matter is the fact that Oltchick kept contemporaneous notes regarding the contacts that he had with Mitchell during the course of settlement negotiations, while Mitchell did not. (*See* Brink Claim File & Correspondence Log ("Oltchick Log"), Ex. 1 of Def.'s Facts, ECF No. 19, at 11-17.)

### 1. The Undisputed Facts Regarding Settlement

The record establishes that Mitchell engaged in communications with two different departments of State Farm beginning in January of 2013. State Farm Insurance Representative Marc Rainey ("Rainey"), the individual assigned to handle PIP claims with respect to Brink's insurance policy, apparently called Mitchell's office to discuss whether PIP benefits were available under Brink's policy. (*See* Hr'g Tr. at 11-13; Mitchell Decl. II ¶ 2; Pl. Theresa V. Whitley's Stmt. of Material Facts & Evidentiary Docs. ("Pls.' Facts"), ECF No. 21, ¶ 2; Def.'s Facts ¶ 7.) Whatever was said orally during that phone call, on January 28, 2013, Rainey wrote Mitchell a letter explaining in writing that due to Brink's policy exclusions, there was no PIP coverage available for this accident. (*See* Jan. 28, 2013, No-Fault Coverage Letter ("Jan. 28 No-Fault Coverage Letter"), Ex. 4 of Def.'s Facts, ECF No. 19, at 21.)[3] Mitchell acknowledged receiving this letter. (*See* Hr'g Tr. at 13-14.) However, Mitchell likely inquired further regarding the availability of PIP benefits since he continued to receive letters and calls from the PIP unit of State Farm reiterating that PIP coverage was

---

[3] The letter stated that the terms of Brink's policy only allowed PIP coverage for Maryland residents and for accidents occurring in Maryland, neither of which is the case here: the decedent was not a Maryland resident and the accident occurred in D.C. (*See* Def.'s Facts ¶ 7.)

unavailable.  (*See* Def.'s Facts ¶¶ 11, 12, 14 (acknowledging that State Farm notified Mitchell that there was no PIP coverage on June 26, July 8, and July 30, 2013); Jan. 28 No-Fault Coverage Letter; June 26, 2013, No-Fault Coverage Letter, Ex. 5 of Def.'s Facts, ECF No. 19, at 23-24; July 30 No-Fault Coverage Letter.)

Meanwhile, in an entirely separate department at State Farm, Oltchick was serving as the liability claim insurance representative in charge of Brink's policy.  (*See* Oltchick Aff. ¶¶ 1-3.)  On March 13, 2013, Oltchick attempted to send Mitchell a letter extending a $100,000 settlement offer, which was the maximum amount allowed under Brink's liability policy, *i.e.*, the "policy limit."  (*See* Hr'g Tr. at 98-101.)  In the letter, Oltchick also requested that Plaintiffs provide certain documents necessary to formalize the settlement.  (*See id.*; Mar. 13 Settlement Letter at 22; Oltchick Log at 11.)  Along with the letter, Oltchick included a release of liability for Plaintiffs to sign (*see* Hr'g Tr. at 96), which stated that by accepting the $100,000 settlement, Plaintiffs would "release[ ] and forever discharge[ ]" Brink and State Farm from any and all claims related to the June 23, 2012, accident.  (*See* Release, Ex. 1 of Pls.' Opp'n, ECF No. 11-2, at 2.)

Mitchell did not receive this initial offer letter, which was returned to Oltchick as undeliverable.  (Oltchick Log at 11; Hr'g Tr. at 72-74.)  However, Oltchick followed up with Mitchell by phone on May 10, 2013, to discuss the settlement offer (*see* Hr'g Tr. at 74, 98; Oltchick Log at 11), and subsequently mailed the settlement offer letter and release to Mitchell's home address per Mitchell's request (*see* Hr'g Tr. at 74; Oltchick Log at 11; Def.'s Facts ¶ 10).  On July 10, 2013, at Oltchick's request, Mitchell sent to State Farm a copy of decedent's death certificate and letters of

administration, and in turn, requested a copy of Defendant Brink's insurance policy. (Pls.' Facts ¶ 7; July 10, 2013, Mitchell Letter, Ex. 3 to Pls.' Facts, ECF No. 21-2 at 8.)[4] On August 28, 2013, Oltchick called Mitchell to check in on the status of the settlement. (*See* Hr'g Tr. at 78-79; Def.'s Facts ¶ 16.) During this phone call, Mitchell stated that Plaintiffs had been out of town, but that Mitchell was hopeful that the matter could be resolved within 30 days. (*See* Hr'g Tr. at 79; Def.'s Facts ¶ 16; *see also* Oltchick Log at 15.)

Mitchell and Oltchick next spoke on September 10, 2013. (*See* Mitchell Decl. II ¶ 10; Def.'s Facts ¶ 17.) It is the substance of that conversation that is the heart of the parties' dispute over whether a settlement agreement was reached, and their competing versions of this exchange are recounted below. It is undisputed that on or about September 19, 2013, Oltchick mailed Mitchell a settlement check in the amount of $100,000, along with a release statement for Mitchell's clients to sign. Mitchell received the check on September 23, 2013, and sent a letter via mail and fax to Oltchick claiming to reject the settlement offer. (*See* Hr'g Tr. at 66; Suppl. Oltchick Aff. ¶ 10; Mitchell Decl. II ¶¶ 11-12.) Mitchell then mailed the settlement check back to Oltchick. (*See* Hr'g Tr. at 66; Mitchell Decl. II ¶¶ 12-13.)

## 2.    Material Facts In Dispute Regarding Settlement

Oltchick testified that he mailed the settlement check to Mitchell on September 19th because the parties had, in fact, reached a settlement agreement. According to Oltchick, Mitchell called him on September 10, 2013, and stated in no uncertain terms

---

[4] Defendant contends Mitchell requested the insurance policy over the phone five days later. (Def.'s Facts ¶ 13.)  Regardless of when Mitchell requested the insurance policy, he did in fact receive a copy. (Mitchell Decl. II ¶ 8.)

that his clients accepted State Farm's $100,000 policy limit settlement offer. (*See* Hr'g Tr. at 80; *see also* Suppl. Oltchick Aff. ¶ 7 (noting that Mitchell called on September 10 and indicated that "the policy limits settlement offer had been accepted by the Plaintiff").) According to Oltchick, during this call, Mitchell specifically directed Oltchick to make the $100,000 settlement check payable to "The Estate of Theresa Whitley and her attorney, Ronald Mitchell." (*See* Hr'g Tr. at 80; Def.'s Facts ¶ 17.) Oltchick also testified that Mitchell's requested manner of payment differed from State Farm's standard practice of issuing settlement checks to the executor of the estate and the plaintiff's attorney. (Hr'g Tr. at 81 ("In light of the fact that we had received the letters of administration, I would have made the check out to the executor of the estate and the plaintiff attorney.").) Thus, Oltchick explained, he made an exception to his ordinary practice when drafting Plaintiffs' settlement check in order to conform to Mitchell's specific request. (*See id.* at 81-83.) Oltchick also testified that Mitchell did not raise any particular concerns or reservations about the settlement agreement during this call, and certainly none with respect to unpaid Medicare liens or PIP benefits. (*Id.* at 80.) Oltchick's correspondence log corroborates this account. (*See* Hr'g Tr. at 81; Oltchick Log at 16; Settlement Check, Ex. 5 of Pls.' Opp'n, ECF No. 11-2, at 12.)

Mitchell's memory of the relevant events differs sharply (although his account of this call has evolved somewhat as this litigation has progressed). Mitchell first maintained simply and solely that he did not accept the offer during the September 10th phone call. (Decl. of Ronald Mitchell ("Mitchell Decl."), ECF No. 11-1, ¶ 10 ("I never informed Mr. Oltchick by telephone on September 10, 2013, that the policy limits settlement offer was acceptable.").) After the parties had briefed the motion to enforce

settlement and this Court requested additional documents, Mitchell provided a second declaration, in which he added that, during the phone call, he expressed concerns to Oltchick about "the issues of policy limits, language in the [release] . . . and payment of medical expenses[,]" and "continued to demand a resolution [of] these issues." (Mitchell Decl. II ¶ 10.)  Consistent with that declaration, Mitchell testified at the hearing that he raised these three allegedly unresolved issues during the call.  (*See* Hr'g Tr. at 39-40.)  Indeed, Mitchell's testimony went further:  he stated that he had actually called Oltchick four months earlier (in May) to reject the settlement offer on the grounds that Plaintiffs (1) sought payment of all medical expenses in addition to the payment of liability, (2) demanded PIP benefits, and (3) objected to certain language in the liability release form.  (*See* Hr'g Tr. at 19, 21; Mitchell Decl. II ¶ 5; Pls.' Facts ¶ 5).[5]  Oltchick testified that the two spoke in May only once to discuss the policy limits offer and that Mitchell did not reject the offer at the time (*see* Hr'g Tr. at 74-75); no other call in the month of May is reflected in his correspondence log that Defendant Brink submitted.  (*See* Oltchick Log at 11-12.)[6]  In fact, Oltchick testified that Mitchell did not reject the settlement offer on *any* phone call throughout the period of negotiations, and that Mitchell also never mentioned any of these grounds for rejecting the offer.  (*See* Hr'g Tr. at 87.)

---

[5] The language Plaintiffs allegedly took issue with was the following: "This release expressly reserves all rights of the parties released to pursue their legal remedies, if any, against the undersigned, their heirs, executors, agents and assigns."  (Release; *see* Pls.' Opp'n at 2.)  Plaintiffs claim that they took issue with this language because they believed it reserved for Defendant the right to sue them.  (Pls.' Opp'n at 2.)

[6] The Court notes, however, that as defense counsel explained at the evidentiary hearing, Defendant Brink did not submit Oltchick's *entire* correspondence log, but only the portion that defense counsel deemed "germane" to the matter at hand.  (*See* Hr'g Tr. at 70, 76, 88.)

The parties do agree that Mitchell and Oltchick spoke by phone nine days after the September 10th call (*see* Hr'g Tr. at 42, 86), but they dispute the content of this conversation, as well. According to Oltchick, he told Mitchell—and followed up in writing—that State Farm would notify Medicare of their settlement agreement as the law requires, and that Mitchell understood and agreed. (*See* Hr'g Tr. at 85-86; Suppl. Oltchick Aff. ¶ 9; Oltchick Log at 17 (noting that he had spoken to Mitchell and explained that State Farm "would be notifying Medicare of settlement[,]" and that Mitchell "[understood] and agreed").) Mitchell, on the other hand, recalled that he asked Oltchick about PIP benefits during this call and stated that resolving the medical expenses issue was necessary to settle the claim—*i.e.*, that in order for Plaintiffs to accept the offer, State Farm would have to pay additional benefits to cover all of the decedent's outstanding medical expenses separate and apart from the $100,000 policy limits offer. (*See* Hr'g Tr. at 42-43; Mitchell Decl. II ¶ 11.) Plaintiffs also contend that it was during *this* phone call that Mitchell told Oltchick to make a settlement check payable to the Plaintiffs' Estate and to Mitchell in the event that the outstanding issues of the medical expenses, PIP benefits, and release language were resolved. (Pls.' Facts ¶ 11.)

### C. Procedural History

On June 13, 2013—after Oltchick first extended the $100,000 settlement offer but prior to the alleged September 10th agreement—Plaintiffs filed the instant action. (*See* Compl.)[7] Plaintiffs' seven-count complaint alleges negligence, wrongful death, and survival actions against two defendants (*see id.* ¶¶ 15–60), both of whom answered

---

[7] Oltchick did not testify about whether or not he was aware of the lawsuit during the parties' ongoing settlement negotiations. (*See* Hr'g Tr.)

and denied liability (*see* Def. Brink's Answer to Compl., ECF No. 9; Def. Scriven's Answer to Compl., ECF No. 13.) On November 6, 2013, Brink filed the pending motion to enforce the settlement agreement, arguing that Mitchell (on behalf of Plaintiffs) and Oltchick (on behalf of Brink) entered into an oral settlement agreement in which Plaintiffs agreed to release all claims against Brink in exchange for the $100,000 policy limit payment. (Mot. to Enforce Settlement Agreement ("Mot. to Enforce"), ECF No. 10, at 1-2.) This Court held an evidentiary hearing on May 29, 2014, at which Mitchell and Oltchick testified. (*See* Hr'g Tr. at 1-2.)

## II.     LEGAL STANDARDS

### A.     Motions To Enforce Settlement Agreements

By filing a motion to enforce a settlement agreement, a party seeks to have the court bind the other party to an alleged agreement to settle claims. *See, e.g.*, *Samra v. Shaheen Bus. & Inv. Grp., Inc.*, 355 F. Supp. 2d 483, 510 (D.D.C. 2005). "It is well established that federal district courts have the authority to enforce settlement agreements entered into by the litigants in cases pending before them." *Ulliman Schutte Constr., LLC v. Emerson Process Mgmt. Power & Water Solutions*, No. 02-1987, 2007 WL 1794105, at *3 (D.D.C. June 19, 2007) (citing *Samra*, 355 F. Supp. 2d at 493). Where, as here, a motion to enforce a settlement agreement is before a district court and there is a genuine dispute as to whether the parties have agreed to enter into a binding settlement, the court must hold an evidentiary hearing and provide an opportunity for cross-examination, as this Court did. *See United States v. Mahoney*, 247 F.3d 279, 285 (D.C. Cir. 2001); *see, e.g.*, *Greene v. Rumsfeld*, 266 F. Supp. 2d 125, 129 (D.D.C. 2003). The party moving to enforce the purported agreement bears the burden of

showing, by clear and convincing evidence, that the parties in fact formed a binding

agreement. *Samra*, 355 F. Supp. 2d at 493 (citing *Quijano v. Eagle Maint. Servs., Inc.*,

952 F. Supp. 1, 3 (D.D.C. 1997)).[8] The clear and convincing evidence standard requires

evidence sufficient to allow the court to "reach a firm conviction of the truth on the

evidence about which [it] is certain." *Samra*, 355 F. Supp. 2d at 494 (alteration in

original) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 (D.C.Cir.1994)).

Because parties seeking to enforce a settlement agreement have no right to a jury trial

given that the relief sought is equitable in nature, the district court makes its own

determinations about the credibility of the parties' testimony. *See Quijano*, 952 F.

Supp. at 3 (citations omitted).

### B.    Oral Contracts

In this case, Brink alleges that the parties entered into an oral settlement

agreement. (Mot. to Enforce at 1-2.) In determining whether an enforceable oral

contract was formed in a case brought under this Court's diversity jurisdiction, the

court applies the choice of law rules of the forum state. *See Samra*, F. Supp. 2d at 493

(where there is diversity of citizenship among the parties, the applicable choice of law

rules are those of the forum state); *see also Quijano*, 952 F. Supp. at 3 (stating that the

"enforcement of settlement agreements is governed by state contract law" (citation

omitted)). Accordingly, D.C. law applies here. *See, e.g.*, *Quijano*, 952 F. Supp. at 3.

---

[8] During oral argument, defense counsel contended that the preponderance of the evidence standard applies to the resolution of a motion to enforce a settlement agreement. (*See* Hr'g Tr. at 124.) While the district court in *Samra v. Shaheen Business and Investment Group, Inc.*, 355 F. Supp. 2d 483 (D.D.C. 2005), used the preponderance of the evidence standard, that diversity case applied *Florida* law. *See id.* at 493, 501. Notably, various other courts in in this district have emphasized that, when applying D.C. law, the movant must meet the higher clear and convincing evidence standard. *See, e.g.*, *Quijano*, 953 F. Supp. at 3; *Hall v. George Washington Univ.*, No. 99-1136, 2005 WL 1378761, at *4 (D.D.C. May 13, 2005); *Beecham v. Socialist People's Libyan Arab Jamahiriya*, No. 01-2243, 2008 WL 2569405, at *2 (D.D.C. June 19, 2008).

Under D.C. law, oral contracts are generally enforceable unless some specific enactment, such as a statute of frauds, renders a specific category of oral contracts unenforceable. *See, e.g.*, *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995) ("Absent any contrary requirement under a statute of frauds, parties may enter into enforceable oral contracts[.]" (citation omitted)). D.C.'s statute of frauds does not require a written settlement agreement between an insurer and a third party. *See* D.C. Code § 28-3501 *et seq.*; *see also Samra*, 355 F. Supp. 2d at 497 n. 10 (noting that oral settlement agreements do not fall within the statute of frauds in D.C. unless the agreement includes something that would bring it within the statute, such as a transfer of real property (citations omitted)). Instead, for a contract—written or oral—to be enforceable under D.C. law, the court must find that there was "(1) an agreement to all material terms, and (2) intention of the parties to be bound." *Duffy v. Duffy*, 881 A.2d 630, 634 (D.C. 2005) (citations omitted); *Steven R. Perles, P.C. v. Kagy*, 473 F.3d 1244, 1249 (D.C. Cir. 2007) (collecting cases).

The first criteria requires that the court determine what terms of the parties' alleged agreement are material, which is a question of fact that depends on the particular circumstances of the case. *See, e.g.*, *Queen v. Schultz*, 747 F.3d 879, 885 (D.C. Cir. 2014). "The material terms of a contract generally include subject matter, price, [and] payment terms[.]" *Id.* at 884-85 (internal quotation marks omitted) (quoting *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370 (D.C. 1990)). In the context of settlement agreements, court have found that the amount to be paid and the claimant's release of liability are the material terms. *See, e.g.*, *Wise v. Riley*, 106 F. Supp. 2d 35, 39 (D.D.C. 2000). By contrast, provisions that are not indispensable and

"not necessary for the parties to understand how they are expected to perform the contract itself" are not material terms of the contract. *Tauber v. Quan*, 938 A.2d 724, 730 (D.C. 2007) (citing *Duffy*, 881 A.2d at 636). Terms may be deemed immaterial when the parties do not discuss them during negotiations, but rather only bring them up after-the-fact. *See Dyer v. Bilal*, 983 A.2d 349, 358 (D.C. 2009) (finding that a confidentiality clause was not a material term in part because neither party mentioned confidentiality while negotiating or accepting the settlement). Moreover, with respect to an oral contract, the material terms of the agreement must be "sufficiently definite" such that the parties are clear about the performance that is due and the obligations that are owed. *Rosenthal*, 573 A.2d at 370 (citation omitted).

Importantly, if the parties have reached an agreement as to all *material* terms, a party's misgivings about *other* terms "do not constitute grounds for relieving a party of his obligations to comply" with the agreement. *Williams v. WMATA*, 537 F. Supp. 2d 220, 222 (D.D.C. 2003) (citations omitted); *see also Dyer*, 983 A.2d at 358 (rejecting the idea that the plaintiff "could always avoid his legal obligations [to an otherwise enforceable contract] by later claiming he meant to include a term that he previously failed to mention" (footnote omitted)). However, under limited circumstances, one party's unilateral mistake may vitiate that party's agreement to a contract. *See Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 271-73 (D.C. 1987). In particular, a unilateral mistake only voids the agreement when it renders the contract unconscionable or the other party knew of or caused the mistake, *see id.* at 272 (citation omitted), provided that the mistaken party had not accepted the risk of the mistake in

either the contract itself or by proceeding with the contract despite its recognition that it only has limited knowledge of the facts related to the mistake. *See id*. at 272.

In addition to finding that there was agreement as to all material terms, the court must also determine that the parties intended to be bound by their words alone. *See Perles*, 473 F.3d at 1249 (citing *New Econ. Capital*, *LLC v. New Mkts. Capital Grp.*, 881 A.2d 1087, 1094 (D.C. 2005), and *Jack Baker*, 664 A.2d at 1238); *Duffy*, 881 A.2d at 636-37 (citation omitted). There is no intent to be bound "if either party knows or has reason to know that the other party regards the agreement as incomplete" or that one party only intends to be bound to a later written agreement. *Perles*, 473 F.3d at 1249 (internal quotation marks and citation omitted). In determining whether the parties intended to be bound, the court looks at "written materials, oral expressions and the actions of the parties[,]" *Duffy*, 881 A.2d at 637 (citations omitted), including "the parties' conduct *after* they reach an alleged oral agreement." *Miller v. Holzmann*, 471 F. Supp. 2d 122, 124-25 (D.D.C. 2007) (emphasis in original) (citing *Perles*, 473 F.3d at 1249). Courts in this circuit have also considered the importance of the transaction and amount of money (or other rights) at stake in determining whether or not the parties intended to be bound by oral agreement alone. *See, e.g.*, *Perles*, 473 F.3d at 1251 (finding incredible that a lawyer intended a telephone call to give rise to a binding agreement worth millions of dollars (citation omitted)).

In sum, the court's role is to consider, based on the particular circumstances presented, whether the parties agreed upon all material terms of the settlement and whether their conduct reflected an intent to be bound by that agreement.

## III.    ANALYSIS

Based on the testimony adduced at the evidentiary hearing and the materials that the parties have submitted, Brink has established by clear and convincing evidence that Oltchick and Mitchell reached an oral agreement as to all material terms of a settlement agreement in September of 2013 and intended to be bound by that agreement. Accordingly, this Court finds that Plaintiffs and Brink have entered into a binding settlement agreement that must be enforced, and thus Plaintiffs are barred from maintaining this legal action against Brink.

### A.    The Testimony Reflects An Agreement To All Material Terms

The record evidence reveals that there are only two material terms to the settlement agreement at issue:  (1) State Farm's payment of the policy limit amount ($100,000) in exchange for (2) Plaintiffs' releasing State Farm and Brink from any further liability stemming from the accident.  The Court finds that the $100,000 offer amount was material to the settlement agreement because payment was indispensable—receiving compensation for the tragic accident that claimed Mrs. Whitley's life was Plaintiffs' entire goal in pursuing legal claims and settlement negotiations.  *See, e.g.*, *Wise*, 106 F. Supp. 2d at 39 (finding the defendant's payoff amount to be a material term of a settlement agreement); *Eswarappa v. Shed Inc./Kid's Club*, 685 F. Supp. 2d 229, 233 (D. Mass. 2010) (same); *see also Queen*, 747 F.3d at 884-85 (noting that payment amount is generally a material term of an agreement (citing *Rosenthal*, 573 A.2d at 370)).

This Court also concludes that Plaintiffs' agreement to release Brink and State Farm from all liability stemming from the collision was a material term of the

settlement. Other courts have concluded that such a release is a material term of a settlement agreement, *see, e.g.*, *Wise*, 106 F. Supp. 2d at 39; indeed, the release can reasonably be construed as the *condition* of payment, and payment conditions are generally deemed material. *See Queen*, 747 F.3d at 885.

It is also clear that the parties themselves considered the release to be material: Oltchick sent Mitchell a release of liability very early on in the settlement negotiations (*see* Mitchell Decl. II ¶ 4), and there is no indication that the expectation that the parties would sign a release ever changed as discussions progressed (*see* Hr'g Tr. at 56). In addition, although there is no record evidence that establishes that Oltchick and Mitchell ever specifically discussed the release form, it is also clear that the parties had assumed that a settlement would result in a release of liability from the start of negotiations. In other words, because releasing State Farm and Brink of liability was at the very core of what any eventual settlement sought to accomplish, *see, e.g.*, *Wise*, 106 F. Supp. 2d at 39-40, Plaintiffs' agreement to release Brink from remaining liability was a material term of the contemplated settlement agreement.

Having found that there were only two material terms of the settlement—the $100,000 policy limit amount and the release of liability—this Court easily concludes that Brink has met his burden of producing clear and convincing evidence that the parties agreed to these material terms. The Court accepts as fact Oltchick's clear and consistent contention that Mitchell unconditionally accepted the agreement, as reflected in Oltchick's contemporaneous correspondence log. Oltchick repeatedly emphasized that Mitchell accepted the $100,000 policy limits offer during the September 10 telephone call. (*See* Hr'g Tr. at 80 (noting that Mitchell called and "indicated that the

offer of $100,000 was accepted"); *id.* (describing Mitchell as saying "you know, [w]e'll accept your offer of $100,000"); Oltchick Log at 16 (stating, in shorthand, that during the September 10, 2013 call, Mitchell "indicated that our pol limit offer is accepted").) What is more, Oltchick testified credibly that Mitchell directed him to make out the settlement check (*see* Hr'g Tr. at 80), and Oltchick firmly stated that Mitchell never raised any particular concerns or reservations about the settlement during that September 10th call (*id.* at 80-81).

The Court is not persuaded by Plaintiffs' evidence to the contrary, which consists of Mitchell's word and Mitchell's word alone. His absence of any notes pertaining to the timing or content of any of the phone conversations is troubling. (*See* Hr'g Tr. at 30-31, 35-36.) Making matters worse, Mitchell's testimony reflects confusion about dates (*see, e.g.*, Hr'g Tr. at 25, 29), which gives good reason to doubt his accuracy, and in turn, his credibility. *See, e.g.*, *Xu Hang Zhang v. Att'y Gen. of U.S.*, 389 F. App'x 158, 161 (3d Cir. 2010). Most important, when asked specifically while under oath whether or not he accepted the policy limits settlement offer during the evidentiary hearing, Mitchell hesitated to respond for nearly an entire minute, and then hedged when he finally answered, stating that in his "opinion" he did not accept. (*See* Hr'g Tr. at 39, 55.) Faced with conflicting testimony, this Court believes Oltchick's testimony that Mitchell accepted the agreement. Consequently, the Court finds there to be agreement by both parties on the material terms of the settlement contract.

Plaintiffs nevertheless argue that there was no enforceable agreement between Mitchell and Oltchick given that *other* disputed issues remained unresolved during the parties' settlement negotiations. In essence, Plaintiffs now insist that there were three

additional material terms of the settlement with respect to which there was clearly no agreement: (1) payment of the decedent's last medical expenses by State Farm, (2) payment of PIP benefits, and (3) an alteration of the specific language of State Farm's release form. This Court rejects Plaintiffs' contention that these were unresolved material terms of the settlement for several reasons.

For starters, Plaintiffs' argument that State Farm's payment of the decedent's medical expenses was material finds no support in the record other than Mitchell's bare allegation that he demanded payment of medical expenses. Oltchick's testimony (which his correspondence log corroborates) was that any reticence that Mitchell may have had about accepting the policy limit offer in light of outstanding medical bills was not expressed to him, nor could Oltchick have addressed that concern, given the previously described dichotomy between liability and PIP benefits and the fact that two different State Farm offices handled these different types of claims. There is also nothing in the record that indicates that Mitchell and Oltchick negotiated direct payment of medical bills separate and apart from the lump sum settlement amount (*see* Hr'g Tr. at 77-79, 84-86), nor is it clear that Mitchell ever considered direct payment of medical bills to be a potential State Farm obligation. (*See* Suppl. Oltchick Aff. ¶ 11; *see also* Hr'g Tr. at 41 (Defendant's counsel asks Mitchell, "[W]hen has [State Farm ever paid directly for medical bills] . . . in any case that you've ever handled? It hasn't. Is that fair? We don't need to belabor it." Mitchell: "Not that I can recall.").) Because there is no evidence on the record (other than Mitchell's testimony) that Mitchell and Oltchick discussed the medical expense issue, and it is the custom and practice of the insurance industry for medical expenses to be satisfied out of the liability settlement payoff (*see*

Hr'g Tr. at 85-86; Suppl. Oltchick Aff. ¶ 8), this Court finds Oltchick's version of events preceding settlement to be far more credible. Consequently, the Court concludes that any demand that State Farm pay for medical expenses separate and apart from the policy limits payout was not material to the agreement. *See, e.g.*, *Dyer*, 983 A.2d at 358 (finding that a confidentiality provision was not material, in part, because neither party mentioned confidentiality during the course of settlement negotiations); *Wise*, 106 F. Supp. 2d at 40 (noting that a plaintiff's insistence on an impossible term is not material).[9]

Plaintiffs' contention that the payment of PIP benefits was an unresolved material term of the settlement agreement is similarly baseless. After observing the parties and hearing them testify under oath at the evidentiary hearing, this Court credits Oltchick's testimony that Mitchell never demanded PIP benefits during their conversations. (*See* Hr'g Tr. at 78.) Although the record evidence does suggest that Mitchell made inquiries about PIP to another State Farm representative at earlier points in time, Mitchell was repeatedly told that PIP benefits were unavailable, and he has acknowledged that, in the face of this clear denial, he did no further research into how or whether PIP benefits might otherwise apply. (*Id.* at 14 (Defendant's counsel asks

---

[9] Even if Mitchell mistakenly believed that he could seek money from State Farm for payment of Plaintiffs' medical bills *in addition* to State Farm's $100,000 policy limit offer (*see* Hr'g Tr. at 41), Mitchell's misunderstanding in this regard is not the type of unilateral mistake that would constitute grounds to rescind an otherwise enforceable agreement to accept the liability payment because there is no evidence in the record to suggest that Oltchick was aware of Mitchell's mistaken understanding, nor is there any reason to believe that Oltchick *caused* Mitchell's purported mistake. *See Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d 263, 271 (D.C. 1987) (noting that unilateral mistakes are only grounds for rescission when the other party knows of the mistake or when the other party causes the mistake). To the contrary, the evidence reflects that Oltchick notified Mitchell about the Plaintiffs' obligation to pay medical expenses out of the liability proceeds, and Mitchell understood that State Farm would pay up to Defendant Brink's policy limit but no more beyond that limit. (*See* Suppl. Oltchick Aff. ¶¶ 8-9; *see also* Exs. 5-9 of Def.'s Facts; Exs. 3-4 of Pls.' Opp'n.) Furthermore, Mitchell admits that he conducted no investigation into whether or not State Farm would pay the medical bills separately (*see* Hr'g Tr. at 15), and it is well settled that a party to a contract bears the risk of a mistake when it knows that it has limited knowledge of the related facts. *See Flippo Constr.*, 531 A.2d at 271.

20

Mitchell, "[D]id you further investigate your client's potential eligibility for P.I.P. [after being denied PIP benefits in January of 2013]?" Mitchell: "No, I did not.").) Furthermore, and tellingly, in the face of these repeated denials, Mitchell also continued to negotiate settlement with Oltchick (suggesting that PIP benefits were not all that important to him), and Mitchell's September 23rd letter to Oltchick that purported to reject the settlement offer did not even list the absence of PIP benefits as a ground for that formal rejection. (*See* Sept. 23, 2012, Letter Rejecting Settlement ("Rejection Letter"), Ex. 2 of Pls.' Opp'n, ECF No. 11-2, at 4.) Under these circumstances, it is not difficult to conclude that the availability of PIP benefits was not material to the parties' settlement agreement.

Plaintiffs' third allegedly unresolved contract issue—the objectionable language in the release of liability form—fares no better. Plaintiffs argue that during negotiations, Mitchell took issue with language from the release form that stated that "[t]his release expressly reserves all rights of the parties released to pursue their legal remedies, if any, against the undersigned, their heirs, executors, agents and assigns." (Release; *see* Pls.' Opp'n at 2.) Plaintiffs contend that they objected to this language on the ground that it would allow Defendant Brink to sue Plaintiffs. (*See* Pls.' Opp'n at 2; Mitchell Decl. II ¶ 5.) Mitchell testified that he specifically raised this issue of the form's release language with Oltchick (*see* Hr'g Tr. at 19), but this Court is convinced by the overwhelming evidence to the contrary. Just as with PIP benefits, Mitchell did not list objectionable release language as a ground for rejecting the settlement offer in his September 23rd letter. (*See* Rejection Letter.) The Court also accepts as true Oltchick's testimony that the release language was never discussed, and that the

allegedly objectionable statement is essentially standard form boilerplate that Mitchell did not reference in any of their discussions. (*See* Hr.'g Tr. at 78, 109.) *See also Dyer*, 983 A.2d at 358. Oltchick also testified credibly that State Farm does not even require that the recipient of settlement funds actually sign and return their release form in order for the settlement money to be tendered and the settlement finalized (*see* Hr'g Tr. at 108); consequently, at least from State Farm's perspective, a claimant's agreement to particular release language is not essential to settlement. *See Tauber*, 938 A.2d at 730 (citing *Duffy*, 881 A.2d at 636). For these reasons, this Court concludes that, while the general agreement to release Plaintiffs' claims against Defendant Brink was a material element of the settlement agreement, *see supra*, the specific language of the release form was not. *See Wise*, 106 F. Supp. 2d at 40 (when the parties have otherwise agreed on a general release in a settlement, the specific language of the release is a "non-issue").

In short, Plaintiffs have failed to point to any additional material terms, or anything else, that would cast doubt on this Court's conclusion that Brink has met his burden of showing by clear and convincing evidence that both parties agreed to all material terms of the settlement agreement.

### B. The Testimony Reflects Both Parties' Intent To Be Bound By The Oral Settlement Agreement

This Court also finds that Brink has shown by clear and convincing evidence that both parties intended to be bound by the settlement agreement, for at least three reasons. First, the fact that Mitchell gave Oltchick unique instructions for drawing the settlement check indicates that he had accepted the agreement, considered it to be final, and sought to obtain payment for his clients. (*See* Hr'g Tr. at 80 (noting that after

Mitchell accepted the $100,000 offer, "he asked [Oltchick] to make out the settlement check in a specific manner"); *id.* at 81 (noting that Mitchell "asked [Oltchick] to make [the check] out to the estate of the deceased and to him" instead of State Farm's normal practice of making the check out "to the executor of the estate" and the attorney); *id.* at 41 (Mitchell notes that he received a check payable to the specific payee that he discussed on the phone with Oltchick).)

The second indicia of the parties' intent to be bound is that nothing in Oltchick's contemporaneous notes suggests that his tender of the settlement check was a conditional offer of settlement. Oltchick testified that when a lawyer is still seeking his client's approval to accept a settlement offer, State Farm will sometimes send a settlement check as a conditional offer contingent upon the client's acceptance, but when Oltchick issues such a check he always includes a note in the claimant's file or on the check itself indicating the conditional nature of the arrangement. (*See id.* at 82.) There is no such note in Oltchick's file for Plaintiffs' case or on the settlement check itself. (*See id.*; Oltchick Log at 17; Settlement Check.) And Oltchick also testified that in his 15-year career as a claims representative he has never mailed a settlement check for an amount as substantial as the $100,000 policy limit in this case without first securing the party's agreement to settle. (*See* Hr'g Tr. at 120 (The Court asks Oltchick, "Have you ever [mailed a contingent check] for any claim . . . in the amount of $100,000?" Oltchick: "No.").) The actions of the parties related to arranging for payment are thus clearly consistent with their having reached a final agreement to which the parties intended to be bound.

Third and finally, the telephone conversation that Mitchell and Oltchick had on September 19, 2013, provides additional support for the conclusion that the parties intended their oral agreement to be binding. Oltchick testified that, during the call on September 19, 2013, he had informed Mitchell that he would notify Medicare of the settlement, and Mitchell "understood and agreed." (*See* Hr'g Tr. at 86; Oltchick Log at 17; *see also* Def.'s Facts ¶ 18.) Although Mitchell contests this admission, this Court credits Oltchick's recorded notes over Mitchell's bare recollection. (*See* Oltchick Log at 17.) Thus, the fact that Oltchick revisited the settlement agreement in a conversation with Mitchell in the days following the oral agreement, and Mitchell did not voice any objections, indicates an intent to be bound by the earlier agreement.

Plaintiffs nevertheless argue that Mitchell's actions after the check was mailed to him—specifically, the fact that Mitchell immediately wrote Oltchick a letter rejecting the settlement agreement and returned the settlement check—reflect that Mitchell did not intend to be bound. (*See* Pls.' Opp'n at 3; Hr'g Tr. at 66.) To be sure, actions taken after an alleged agreement is reached are relevant to assessing a party's intent to be bound, *see Miller*, 471 F. Supp. 2d at 124-25 (citing *Perles*, 473 F.3d at 1249), but Mitchell's actions after receiving the agreed-upon settlement amount do not reflect a lack of intent to be bound at the time the oral agreement was reached. On this record, it is far more plausible that Mitchell accepted Oltchick's offer on behalf of his clients, intended that it be final and binding, and later had misgivings about his earlier decision to accept. Unfortunately for Plaintiffs, courts have long held that such buyer's remorse does not vitiate a demonstrated *initial* intent to be bound by the settlement agreement. In *Carlson v. State Farm Mutual Automobile Insurance Co.*, 76 F. Supp. 2d 1069 (D.

Mont. 1999), *aff'd*, 11 F. App'x 954 (9th Cir. 2001), for example, the court considered an alleged oral settlement agreement between the plaintiff—also the victim of an automobile accident—and State Farm. *Id.* at 1072-73. After the oral acceptance, the plaintiff later raised an objection, claiming that she did not intend to be bound by her oral agreement alone because she intended to give up her claim only after signing a written document. *Id.* at 1076. The court pointed out that her requirement of written terms had not been raised either during the course of settlement negotiations or at the time of acceptance, and enforced the settlement agreement, declining to permit the plaintiff to "foreswear" subsequently a previously agreed-upon contract. *Id.*

Such is the case here. Although it is undisputed that Mitchell objected to the settlement two weeks after he orally accepted the offer, this Court finds that he did not raise these objections to Oltchick prior to accepting the policy limits offer. (*See* Hr'g Tr. at 76-77.) Consequently, just as in *Carlson*, Mitchell's belated objections do not convince the Court that Plaintiffs did not intend to be bound by the agreement. *See Carlson*, 76 F. Supp. 2d at 1076; *see also Williams*, 537 F. Supp. 2d at 222 (stating that one party's post hoc misgivings about a contract do not constitute legal grounds for rescinding an already accepted agreement); *Ulliman Schutte Constr.*, 2007 WL 1794105, at *7 ("A party cannot avoid the effects of a valid oral settlement agreement because of second thoughts[.]" (citation omitted)); *Greene*, 266 F. Supp. 2d at 137 (a "change of heart" of a party to a settlement agreement is not a basis upon which to relieve the party of his obligations under the terms of the agreement).

## IV.  CONCLUSION

For the reasons set forth above, this Court concludes that Defendant Brink has met his burden of demonstrating by clear and convincing evidence that, on or about September 10, 2013, Plaintiffs' counsel and State Farm representative Oltchick orally agreed to the material terms of a settlement agreement and likewise intended to be bound by that arrangement.  Accordingly, as set forth in the separate order accompanying this opinion, Defendant Brink's motion to enforce the settlement agreement between the parties is **GRANTED**.

DATE: August 11, 2014

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge